**FEDERAL TRADE COMMISSION,
Plaintiff,**

v.

**GREAT LAKES CHEMICAL CORPORATION, et al., Defendants.**

**No. 81 C 3067.**

United States District Court,
N. D. Illinois, E. D.

July 23, 1981.

David C. Shonka and John V. Lacci, F. T. C., Washington, D. C., for plaintiff.

Donald G. Kempf, Jr., Daniel W. Vittum, Jr., Kirkland & Ellis, Chicago, Ill., for defendant Great Lakes Chemical Corp.

William O. Fifield, Sidley & Austin, Chicago, Ill., for defendant Velsicol Chemical Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McGARR, District Judge.

This action was commenced by the Federal Trade Commission ("FTC") on June 3, 1981. The FTC's complaint seeks a preliminary injunction barring Great Lakes Chemical Corporation ("Great Lakes") from acquiring the bromine-related assets of Velsicol Chemical Corporation ("Velsicol").

Defendant Great Lakes is a Delaware corporation transacting business in this district. Great Lakes is an integrated producer of elemental bromine and several bromine derivatives, including fumigants, solvents, lubricants and flame retardants. Its 1980 net sales exceeded $125 million.

Defendant Velsicol is a Delaware corporation transacting business in this district. Velsicol is a wholly owned subsidiary of defendant Northwest Industries, Inc., which is also a Delaware corporation transacting business in this district. Velsicol's principal business has been and is the production of agricultural pesticides. In 1976, Velsicol merged with Michigan Chemical Corporation, another Northwest Industries subsidiary, and thereby became a producer of elemental bromine and bromine derivatives. Of Velsicol's total 1980 net sales, less than 7.4% were of bromine and bromine derivatives.

The transaction at issue involves Great Lakes' proposed acquisition of Velsicol's bromine-related assets, which consist of a research and development facility in Ann Arbor, Michigan; a plant in El Dorado, Arkansas that produces bromine and bromine derivatives; Velsicol's bromine fields; and Velsicol's bromine-related receivables. Currently, Velsicol is conducting minimal basic research and development at its Ann Arbor facility, and its El Dorado plant is temporarily shut down. In exchange for these assets, Great Lakes will pay approximately $29.7 million.

A four-day evidentiary hearing was held from June 28, 1981 until July 2, 1981, on the FTC's request for a preliminary injunction. In addition to testimony, the court also had before it numerous affidavits, hundreds of documents, and many depositions.

The FTC's action is brought under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), which provides that a district court may enjoin an acquisition when, both "weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."

■ A preliminary injunction is an "extraordinary and drastic remedy," particularly in the merger and acquisition context. *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C.Cir.1980) (Section 13(b) action). "Experience seems to demonstrate that...the grant of a temporary injunction in a Government antitrust suit is likely to spell the doom of an agreed merger...." *Mis-*

*souri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 870 (2d Cir.), *cert. denied*, 419 U.S. 883, 94 S.Ct. 3210, 41 L.Ed.2d 1161 (1974). These general observations are particularly important here, for Mr. Kampen, Great Lakes' Chief Executive Officer, testified that Great Lakes would exercise its right to cancel the transaction if a preliminary injunction were entered.

■ In light of the severe adverse consequences of a preliminary injunction, the FTC has a substantial burden under Section 13(b). First, it must prove a "likelihood of ultimate success" in an administrative hearing under Section 7 of the Clayton Act, 15 U.S.C. § 18, which bars mergers whose effects "may be substantially to lessen competition." As this court has previously noted in an essentially similar context:

> What degree of certainty I must reach as to the likelihood of such success has been the subject of much judicial discussion. It is clear that the word "may" in Section 7 is not to be used in the loose sense with which it is employed in ordinary conversation. The Government must prove not that the merger in question may possibly have an anti-competitive effect, but rather that it will probably have such an effect. And the Government must have demonstrated at this stage in the case a likelihood that it can meet this burden.

*United States v. Amsted Industries, Inc.*, 1972 Trade Cas. ¶ 73,902 at p. 91,743 (N.D. Ill.1972).

In addition to proving likelihood of success, the FTC must show that "the equities" favor enjoining the transaction. In essence, this requires the FTC to prove that the harm to the parties and to the public that would flow from a preliminary injunction is outweighed by the harm to competition, if any, that would occur in the period between denial of a preliminary injunction and the final adjudication of the merits of the Section 7 claim. *Id.* Courts have recognized that public equities such as increased exports and benefits to local communities are "important equities" that can lead to denial of preliminary relief even where the FTC

shows the requisite likelihood of success. *FTC v. Weyerhaeuser Co.*, 1981–1 Trade Cas. ¶ 63,974 at pp. 76,047–48 (D.D.C.), *aff'd*, —— F.2d ——, 1981–2 Trade Cas. ¶ 64,263 (D.C.Cir.1981). When weighing these equities, the court must consider whether divestiture would be an adequate remedy if, in fact, the FTC eventually prevails on the merits, since the purpose of Section 13(b) is to preserve the ability to "order effective, ultimate relief," not to bar all mergers that the FTC staff preliminarily views as suspicious. *FTC v. Exxon Corp.*, 1979–2 Trade Cas. ¶ 62,972 at p. 79,538 (D.D.C.1979), *aff'd*, 636 F.2d 1336 (D.C.Cir. 1980).

The Section 7 analysis in this case is permeated by the noncompetitive conditions of Velsicol's bromine-related operations. As will be discussed in greater detail subsequently, the weakened state of these operations is significant in three respects.

■ First, when assessing the likely competitive effects of the transaction, the declining condition and bleak prospects of Velsicol's bromine-related operations are evidence of its "weakness as a competitor." *United States v. International Harvester Co.*, 564 F.2d 769, 773 (7th Cir. 1977) (citation omitted). The competitive weakness of one of the two merging parties goes "to the heart of the Government's statistical prima facie case," *United States v. General Dynamics Corp.*, 415 U.S. 486, 508, 94 S.Ct. 1186, 1199, 39 L.Ed.2d 530 (1974), and warrants a finding that no substantial lessening of competition is likely to occur in any market without reaching the issues of geographic and product markets. *Id.* at 511, 94 S.Ct. at 1200. As the Seventh Circuit held, such evidence "establishes that the Government's past market statistics are really insufficient to constitute a *prima facie* case" where the company's weaknesses "would not allow it to be as strong a competitor as the bald statistical projections indicate." *United States v. International Harvester Co.*, 564 F.2d 769, 773 (7th Cir. 1977) (footnote omitted).

Second, the evidence in this case has established a classic "failing company" defense.

Third, even if the court were to conclude preliminarily that the FTC had established a likelihood of success and that Velsicol is not a failing company, the debilitated condition of Velsicol's bromine operations is an important equity to be considered because a preliminary injunction would exacerbate Velsicol's problems even though the preliminary injunction hearing involves only a tentative assessment and a final adjudication of the above two defenses must await an administrative hearing on the merits. *See United States v. G. Heileman Brewing Co.*, 345 F.Supp. 117, 122–24 (E.D.Mich.1972).

The FTC focused on the definition of the relevant market, which, as the FTC states, is typically where a Section 7 analysis begins. The purpose of defining the relevant market is to provide a commercially meaningful context within which to address the "crucial question" of the merger's competitive effects. *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549–50, 86 S.Ct. 1665, 1667–68, 16 L.Ed.2d 765 (1966).

■ The court finds that the relevant market in this case encompasses all flame retardants, however derived, rather than brominated flame retardants only. This market definition gives recognition to the substantial evidence of intense competitive pressures flame retardants derived from bromine face from flame retardants derived from other elemental chemicals such as phosphorus, sulfur and chlorine.

Brominated and non-brominated flame retardants must be included in a single market so as "to recognize competition where, in fact, competition exists." *Brown Shoe Co. v. United States*, 370 U.S. 294, 326, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). Several "practical indicia" point to a single flame retardant market: (1) a single end use; (2) industry recognition; (3) the existence of producers who make both brominated and non-brominated flame retardants; (4) similarity in production processes; (5) common customers; and (6) cross-elasticity of demand.

A variety of chemicals are used to make flame retardants, including aluminum, chlorine, phosphorus, sulfur, antimony, boron, and bromine. Regardless of the chemical from which it is derived, a flame retardant has but one purpose. All flame retardants perform the same function of increasing the ignition temperatures of the product to which they have been added and slowing down the flame spread across the face of the product.

There is widespread industry recognition of a single, overall flame retardant market. As summarized by Barry Saxe of Stauffer Chemical Company, a manufacturer of phosphorus flame retardants:

> In my judgment, there is a flame retardants market, which consists of all flame retardants, including those containing phosphorus as well as those containing bromine. A consumer of flame retardants is interested only in obtaining the best flame retardant on a cost-performance basis for a specific end use, such as urethane foams. It generally does not matter to a consumer whether the flame retardant it purchases for a specific end use contains phosphorus or bromine or some other chemical, so long as the flame retardant purchased is the most cost-effective one available for the specific end use.

(DX 4 (Saxe Aff. ¶ 8)).

Another practical indicia of a single flame retardants market is that at least some producers make both brominated and non-brominated flame retardants. For example, Ferro Chemical Corporation makes brominated and chlorinated flame retardants. Indeed, Velsicol, in addition to making PHT4 and FireMaster 680, both brominated flame retardants, makes chlorindic anhydride, a chlorinated flame retardant which competes with Ethyl's brominated flame retardant for application in polyesters. After the consummation of the challenged transaction, Velsicol will continue to sell its chlorinated flame retardant.

As one FTC affiant testified on deposition, the manufacturing processes of brominated and chlorinated flame retardants are essentially the same in that both require a reaction process, a receiver tank process, separation, grinding, and packaging.

Brominated and non-brominated flame retardants compete for sales to the same customers on two distinct but equally significant levels. On the level of direct sales, customers who produce flame retarded materials (such as plastics and polyesters) can select from among various brominated and non-brominated flame retardants. Examples include:

(a) Olin's RF–230, which contains phosphorus and chlorine, competes with brominated flame retardants for application in polyurethane.

(b) Chlorindic anhydride, derived from chlorine, competes with tetrabromophthalic anhydride for application in polyunsaturates.

(c) Dechlorane Plus, derived from chlorine, competes with brominated flame retardants for application in polyolefin wire and cable.

(d) General Electric has replaced tetrabromobisphenol-A, derived from bromine, with a sulfur-based sulphonic acid salt for application in its polycarbonate plastic.

(e) BASF replaced PHT–4, derived from bromine, with a chlorinated flame retardant for application in rigid urethane systems.

(f) Ethyl's brominated BT–93 competes with Hooker's chlorinated Dechlorane Plus for application in cross link polyethylene.

(g) Ethyl's brominated RB 49 competes with Velsicol's chlorindic anhydride for application in polyesters.

(h) DBP, derived from bromine, competes with a large number of chlorinated phosphorus compounds for application in urethane foams.

Brominated and non-brominated flame retardants also compete as components of materials, such as plastics, which, in turn, compete with one another for end uses. Competition among flame retardants at the end use level is substantial, since the cost of the flame retardant may approach 25% to 30% of the raw material costs of a plastic.

For example, three flame retarded plastics are used in the manufacture of television cabinets, which today must meet certain flame retardant standards. These three plastics are HIPS, ABS, and Noryl. HIPS currently uses a bromine-based flame retardant; Noryl uses a phosphorus-based flame retardant; and ABS uses either a bromine-based or chlorine-based flame retardant. The bromine-based flame retardants presently used in HIPS are completely different than the bromine-based compounds used as flame retardants in ABS and are not interchangeable. In choosing among these three plastics for use in the television cabinet, the cabinet manufacturer looks at the cost of the three plastics in terms of a cost-per-cubic-inch of plastic.

A second example of competition at the end use level involves the competition between expandable polystyrene insulation board and rigid urethane insulation board. Rigid urethane board is more expensive than expandable polystyrene insulation board and the extent to which customers trade off between the two products is determined by the relative selling prices. Any changes in those selling prices would change the customers' selection of expandable polystyrene insulation board versus rigid urethane insulation board.

A third example of how end use product competition affects competition among flame retardants is shown in defendants' Exhibit 56. That exhibit shows the results of flammability tests conducted on three different types of flexible foam systems. One foam system is neophrene, a chlorinated elastomer which is fire retardant; the second is a flexible polyurethane which has a flame retardant that is either brominated or of a chlorine-phosphorus base; and the third is a polyurethane foam that is flame retarded by means of an inorganic phosphorus compound.

At both levels of competition, there exists cross elasticity of demand among all types of flame retardants. As Mr. Anderson of Ethyl explained, where chlorinated and brominated flame retardants can both be used in the same material, the purchaser will select the more cost-effective of the two. If the price of one rises relative to the price of the other, the purchaser would be likely to switch. Or, as summarized by John Morgan of Union Carbide:

> As a consumer of flame retardants, Union Carbide is interested only in obtaining the best flame retardant on a cost-performance basis for a specific end use, such as polysulfone compounds or polyethylene compounds. It simply does not matter to Union Carbide whether the flame retardant it purchases for specific end use contains bromine or not, so long as the flame retardant purchased is the most cost-effective one available for the specific end use.

(DX 2 ¶ 12).

Cross elasticity of demand also exists at the secondary, or end use, level. Great Lakes takes into account the competition between the particular polymer system for which it supplies the flame retardant and other polymer systems containing other flame retardants. Great Lakes prices its flame retardant in order to maximize the sales of its customers' polymer systems.

An example of cross elasticity of demand for flame retardants at the end use level is the competition between ABS, HIPS and Noryl for sales to television manufacturers. If the producer of one of the flame retardants raised its price, there would be a corresponding price increase in the plastic in which it is used. Customers would then turn to one of the other plastics, thus reducing the demand for the more expensive flame retardant. As stated by Mr. Otis of General Electric, the manufacturer of Noryl, the competition among plastics for end use means that there is "direct competition among the various brominated and non-brominated flame retardants that go into these plastics." Mr. Otis concluded:

> Given the competition between plastics containing brominated flame retardants and plastics containing non-brominated flame retardants, there is no "brominated flame retardant market" per se. Particularly in the large end use markets served by Noryl, HIPS, ABS, PVC and PVC–

ABS alloys, all flame retardants—brominated and non-brominated—compete in one area.

(DX 13 (Otis Aff.)).

█ In sum, the practical indicia of *Brown Shoe* lead to the conclusion that the FTC's suggested brominated flame retardant market must be rejected in favor of the commercially meaningful flame retardant market. Within this market, the evidence established that the proposed acquisition is not likely to lead to a substantial lessening of competition.

The FTC's proferred market share and concentration statistics within the overall flame retardant market are questionable. No witness appeared at trial to explain these statistical data, and the accompanying accountant's affidavit states only that the charts are based on documents produced in response to subpoenas duces tecum and Hart-Scott-Rodino requests. It is clear, however, that the author of these charts confined himself to too narrow a data base. Thus, whereas the FTC exhibit lists only eleven flame retardant producers, the Modern Plastics Encyclopedia lists over 50 flame retardant producers who make over 250 different flame retardants. Among the companies excluded in the FTC's exhibit are such large flame retardant manufacturers as Monsanto. The court is unwilling to rely on FTC market share statistics that unaccountably exclude significant competitors.

In any event, the focus of a proceeding such as this should not be on numbers, but rather on commercial realities. As the Supreme Court explained in *United States v. General Dynamics Corp.*, 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974), when confronted with theories and citations almost identical to those advanced by the FTC in this case, statistical data are "not conclusive indicators of anticompetitive effects," and "only a further examination of the particular market—its structure, history, and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger."

There do not appear to be significant barriers to new entry. According to the FTC's evidence, the number of brominated flame retardant producers has grown by 37.5% in the last five years. And the FTC-sponsored affidavit of Mr. Hall of Pearsall Chemical Corporation states that Pearsall's cost of entry was a mere $50,000. (FTC Ex. 75 ¶ 14).

Also, as noted above, price competition among producers of the various types of flame retardants is intense. Of particular note in this regard is Great Lakes' performance. Since Great Lakes began producing BA–59 and DE–83, the prices of those flame retardants have dropped substantially.

The most important aspect of the flame retardant market for purposes of evaluating this acquisition is the competition that has occurred and is occurring in research and development which is the lifeblood of the business. (DX 3 (Dempsky Aff. ¶ 5); DX 4 (Saxe Aff. ¶ 7); DX 1 (Welch Aff. ¶ 4); DX 2 (Morgan Aff. ¶ 10); DX 19 (White Aff. ¶ 5)). As stated by Mr. Morgan, a retardant consumer: "A particular flame retardant which is the most cost-effective product for a specific end use today may not be the best flame retardant for the same application in a few more years." (DX 2 (Morgan Aff. ¶ 10)).

Mr. Morgan's general observation is borne out by the history of the use of certain flame retardants in ABS applications. During the 1960's, the flame retardants of choice for ABS plastics applications were the chlorinated paraffins. Then in the early 1970's, hexabromobiphenyl replaced chlorinated paraffins as the product of choice. However, hexabromobiphenyl, which is also known as PBB, ran into some toxicological problems in the mid-1970's, and it was replaced by FireMaster 680 and, now, DE–79. What the product of choice will be in future years will be determined by the research and development efforts of the various flame retardant manufacturers.

Even the FTC's affiants have emphasized the significance of R&D in the flame retardants business. Mr. Doelling of Saytech

testified in his deposition that research and development is "an important factor in the flame-retardant business." (DX 70 (Doelling Dep. at 48)). So important is research and development that, according to Mr. Doelling, any flame retardants producer which stopped research and development would survive "no more than five years" with its sales "declining all the way." (*Id.* at 49–50). In other words, Mr. Doelling explained, "If you don't have replacement products coming on or products for new applications, again you can envision yourself being out of business." (*Id.* at 50). In order to avoid that predicament, Mr. Doelling's company "continually tries to identify new end uses for brominated flame retardant compounds." (FTC Ex. 122 (Doelling Aff. ¶ 21)).

Other FTC affiants concur in Mr. Doelling's assessments. Mr. Holt of Borg-Warner reported that his company "considers the research and development and technological ability of a flame retardant supplier to be vitally important." (Holt Aff. (FTC Ex. 124 ¶ 24)). Thus, "[a]s new flame-retardants are developed, whether or not containing bromine... BWC may purchase such other flame-retardant products." (*Id.* ¶ 11). Echoing Mr. Holt's testimony are Messrs. Wikman and Anderson of Ethyl, who stated that "technology is vitally important to success" in the flame retardants industry. (FTC Ex. 70 (Wikman Aff. ¶ 17); (FTC Ex. 70 (Anderson Aff. ¶ 22)).

Thus, in this constantly evolving market, a company's future ability to compete is reflected less in past production statistics than in the vigor of its current research and development efforts. Competition, thus understood, will not be lessened by this acquisition. For, while Great Lakes is firmly committed to developing new and better products, Velsicol has discontinued basic research and development into new products. Thus, competition in R&D will be increased when Great Lakes revitalizes Velsicol's R&D facility.

Even focusing on production statistics, the evidence established that the acquisition will not lessen competition. A specific flame retardant, whether derived from bromine or other chemicals, cannot be used in more than a handful of applications. Great Lakes' and Velsicol's flame retardants are not suitable for the same applications. Consequently, since "few product overlaps or duplications of product exist," the merger is between complementary rather than competing firms. (FTC Ex. 6) *See United States v. General Dynamics Corp.*, 341 F.Supp. 534, 558 (N.D.Ill.1972), *aff'd*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *United States v. Consolidated Foods Corp.*, 455 F.Supp. 108, 137 (E.D.Pa.1978).

Great Lakes' two principal flame retardants are tetrabromobisphenol-A, which is sold as BA–59, and decabromodiphenyl oxide, which is sold as DE–83. BA–59 is sold for epoxy resins and for polycarbonates. DE–83 is used in high impact polystyrene ("HIPS"), which is a plastic. These two products account for more than 90% of Great Lakes' flame retardant sales. Velsicol does not produce either BA–59 or DE–83. Nor does Velsicol make any products that compete with BA–59 or DE–83 as flame retardants for their end use plastics.

Velsicol's principal flame retardants are Bistribromophenoxythane, sold under the trade name of FireMaster 680, and tetrabromophthalic anhydride, which is sold under the trade name PHT–4. These two products account for approximately 85% of Velsicol's sales. Great Lakes has never made either of these products. The flame retardants sold by Great Lakes do not compete with those sold by Velsicol. PHT–4 is sold as a flame retardant for use in unsaturated polyesters and rigid polyurethane systems. FireMaster 680 is sold exclusively as a fire retardant for certain types of ABS where ultraviolet light stability is important but "bloom," or discoloration, is relatively unimportant. Great Lakes' DE–79 is sold for use in other types of ABS where it is important that there be no blooming in the finished plastic but where ultraviolet stability is less important.

Because of the absence of overlap between Great Lakes' and Velsicol's flame retardants, there is no antitrust significance

to the FTC's assertion that Great Lakes has a dominant position in tetrabromobisphenol-A and decabromodiphenyl oxide and that Velsicol has a dominant position in FireMaster 680. Moreover, Great Lakes has substantial present and future competition for tetrabrom and decabrom sales:

(a) The Dead Sea Works in Israel exports to the United States nearly one-third of all tetrabrom consumed here. (DX 22; DX 70). It is regarded as an aggressive marketer of brominated flame retardants.

(b) Ethyl is in the process of introducing its own tetrabrom and expects to achieve a 30% share of worldwide sales of tetrabrom within three years, without regard to whether the proposed acquisition is consummated. (DX 70 (Anderson Dep. 80)).

(c) Dow previously produced tetrabrom and has retained the capability and technology to resume production. (DX 70 (Anderson Dep. 79–80)).

(d) Dow makes a decabrom for both captive use and merchant sales.

(e) Saytech produces decabrom and the product constitutes 45% of its total sales. (DX 31). In the near future, it will become even more cost-competitive with other decabrom producers because it is moving its decabrom production from its New Jersey plant to its Magnolia, Arkansas facility. In so doing, Saytech will no longer incur the cost of shipping bromine from Arkansas to New Jersey. (Anderson Dep. at 44–45).

(f) White Chemical produces decabrom. (DX 22).

(g) Doelling testified that the Dead Sea Works could begin producing decabrom (Doelling Dep. at 68), and Ethyl's Five-Year Plan regards the Dead Sea Works as a possible entrant. (DX 22).

Concerning Velsicol's "dominance" in FM 680, the evidence showed that the demand for FM 680 is rapidly declining and will taper off to insignificant amounts. Borg-Warner, the principal FM 680 purchaser, has decided to cease buying the product, and Ethyl documents state that non-halogenated flame retardants may replace FM 680 entirely for use in ABS. (DX 27).

In sum, substantial evidence in the record showed that competition in the flame retardant market is vigorous and is likely to remain so.

(a) Mr. LaTorre of BASF, a purchaser of flame retardants from Velsicol, sees only benefits from the acquisition because Great Lakes is a more cost-efficient producer, which will mean lower prices, and because Great Lakes is a more reliable and long-term source of supply. (LaTorre Tr. 236).

(b) Mr. Welch of Borg-Warner, another purchaser, favors the transaction because it "will provide continuity of future supply" and because Great Lakes can utilize Velsicol's facilities more effectively and thereby reduce prices. (Welch Aff. ¶ 6).

(c) Mr. Morgan of Union Carbide, still another purchaser, explained that "Great Lakes will likely produce more flame retardants with Velsicol's El Dorado plant and related assets than Velsicol would produce with the same assets. Thus, the total flame retardants supply will likely be expanded with the acquisition." (Morgan Aff. ¶ 6).

(d) Mr. Dempsky of Reichhold Chemicals, another purchaser, stressed that "the industry relies on an on-going research and development effort in order to provide improved flame retardant materials." Noting his experience that Great Lakes "is committed to research and development" but that Velsicol "has not been doing the research and development sufficient to meet our needs for some time," Mr. Dempsky concluded that the acquisition "could result in an increase in supply of flame retardants, to the benefit of consumers." (DX 3 ¶¶ 5–6).

(e) Mr. Spottl of CIBA–GEIGY, another purchaser, stated that his sources of supply have been adequate in the past, that he expects them to remain adequate after the acquisition, and that he cannot foresee any adverse effects on price. (DX 8–9).

(f) Mr. Dolinski of Dow Chemical, a competing producer, explained that "there is substantial competition in the United States in the production and sale of flame retardants," that the acquisition would not lessen competition in the production and sale of brominated flame retardants, and that he communicated these views to the FTC staff attorneys before the FTC filed this suit.

The FTC has argued that there is another market in this case—an "elemental bromine market." The existence of such a market has no antitrust significance in this case for several reasons. First, it is undisputed that tremendous overcapacity exists in the bromine industry. Domestic bromine production capacity is approximately 650 million pounds per year. Today, the unused capacity is almost 300 million pounds, which means the industry is operating at approximately 57% of capacity. The Bureau of Mines has projected substantial overcapacity through the year 2000. (DX 70 (Lyday Dep. 8)). The Ethyl Corporation, which operates the world's largest bromine production facility (DX 29; DX 70 (Anderson Dep. 26)), is running at 60% of capacity. (DX 70 (Anderson Dep. 31)). Dow, another major producer, also recognizes that "substantial overcapacity" exists in domestic bromine production facilities. (DX 63 (Dolinski Aff. ¶ 3)).

This overcapacity is the result of a dramatic decline in demand for bromine due largely to the fact that the principal end use of bromine, ethylene dibromide ("EDB") was legislated out of existence in 1974. EDB, an additive for leaded gasoline, is not used in unleaded fuel. When the federal government began requiring automobiles to use unleaded gas, demand for EDB, and, consequently, bromine, plummeted. Whereas in the 1960's, 70% of the bromine produced was used in EDB, today only 20% to 30% is used (Smith Tr. 167–68), and that amount will continue to decline. (DX 70 (Anderson Dep. 33) (Malmberg Tr. 149–58).

Demand has also declined due to the effective outlawing of PBB and TRIS, two other substantial uses of bromine. (DX 19 White Aff. ¶ 10) (Beasley Tr. 435–36). New applications have not been developed to fill this enormous loss of demand.

Great Lakes is the exception to the overcapacity situation. Not only does it produce at capacity, it is actually a net buyer of bromine. In fact, Great Lakes purchases so much bromine from Velsicol that a vertical relationship exists between the two companies, with Great Lakes taking up to half of Velsicol's output. Great Lakes' status as a net buyer is due in part to the fact that it has been successful in developing and marketing new brominated flame retardants to compete with non-brominated flame retardants. (Smith Tr. 171).

The vigor of competition in the bromine field is confirmed by the history of bromine prices. A report from the United States Bureau of Mines shows that the absolute price of bromine has remained approximately the same since 1958. At that time, bromine cost 21.98¢ per pound; today it sells for 22.03¢ per pound. (DX 41). When inflation is considered, the real price of bromine actually fell 60% during that time period. (DX 41). Price projections for the next five years show that, in real dollars, bromine prices will continue to drop. (Malmberg Tr. 158–59).

Bromine buyers take advantage of the price competition among suppliers through various tactics. Mrs. Malmberg testified that, in negotiating supply contracts, buyers successfully play off one supplier against another, using one supplier's better offer to force another bromine supplier to drop its price. (Malmberg Tr. 155). In this regard, Mrs. Malmberg testified that Great Lakes is an aggressive price-cutter. She stated that if Velsicol's capacity is put in Great Lakes' hands, prices may be further reduced. (Malmberg Tr. 159–60, 61).

The government argues that the proposed acquisition will reduce the number of bromine producers and will therefore lessen competition. However, the evidence does not support that conclusion. Currently there are five domestic bromine producers: the Ethyl Corporation, Great Lakes, Dow,

Velsicol, and ACI. In addition to these domestic suppliers, the Dead Sea Bromine Works, an Israeli company and the largest foreign producer (Smith Tr. 169), is an aggressive company which markets bromine and a variety of brominated flame retardants.

There are no high barriers to entry in the bromine production business. The reason new companies have not come into the bromine production business since the entry of ACI and Ethyl is that the return on investment is low. For example, White Chemicals considered entering into bromine production in 1974–1975 but ultimately concluded it was uneconomical to produce bromine. (DX 19 (White Aff. ¶ 8–10)). Morton-Norwich, one of the FTC's affiants, is clearly a potential entrant. It has access to brine fields and bromine technology and could enter the market if the price of bromine made production economical. (FTC Ex. 76 (Rowlett Aff. ¶ 10)). Mr. Wikman, one of Ethyl's employees, testified at his deposition that, if the price of bromine increased significantly, entry by new companies would be likely. (DX 70 (Wikman Dep. 13)).

These circumstances demonstrate that, if prices increased, collusively or otherwise, companies now poised to enter the market would do so; those already in the market, and operating substantially below capacity, would increase output and importers such as the Dead Sea Works would increase their sales.

These factors alone suggest that bromine prices will not increase. Mr. Doelling testified that the cost of bromine, as well as other chemicals used to flame retard plastics, such as chlorine, phosphorus, boron and antimony, "will remain the same relative to current costs, adjusting for inflation." (DX 70 (Doelling Dep. 74)).

In addition to overcapacity and its attendant procompetitive effects on supply and price, there is a second critical factor that demonstrates the absence of any lessening of competition in a bromine area. Bromine is an intermediate product. Bromine is of commercial significance only when mixed with other chemicals to make new compounds. As Mr. Anderson stated, "Bromine does not reach the consumer as bromine." (DX 70 (Anderson Dep. 28); see Smith Tr. 166)). In fact, over 90% of all bromine produced is used by the producers themselves to make various bromine derivatives. Only 10% or so is sold either to producers or companies not basic in bromine. (Smith Tr. 170).

Bromine production, standing alone, is not a viable business. Thus, each producer also manufactures bromine derivatives. (Smith Tr. 170). Given this vertical integration, any increase in the price of bromine would be borne largely by the producers themselves. In fact, an increase in the price of bromine would hurt producers because it would make brominated products, such as flame retardants, less competitive with other, similar products, such as chlorinated flame retardants. It also would make the end products into which their brominated compounds are mixed, less competitive with competing, non-brominated end products, thus further reducing demand.

Producers of brominated derivatives, such as brominated flame retardants, prosper only to the extent they can develop more cost-effective products that will be chosen over competing products and consumed in large quantities. In turn, by making the end products such as plastics more price competitive, bromine product makers can expand their sales. In short, the structure of the industry is such that bromine producers have strong incentives to keep the price of bromine low.

A key factor to consider in analyzing whether the proposed acquisition will violate Section 7 is the impact of the transaction on bromine customers. As the court stated in *United States v. Tidewater Marine Service, Inc.*, 284 F.Supp. 324, 338 (E.D.La. 1968), "(i)n measuring the anticompetitive effect of a merger, we must examine its effect on . . . the customers of the merged companies." *See also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 n. 10, 97 S.Ct. 690, 696, 50 L.Ed.2d 701

(1976) (antitrust laws are for the protection of the "people of the United States as individuals, especially consumers"); and *Apex Hosiery v. Leader*, 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940) (antitrust laws designed to prevent lessening of competition "to the detriment of purchasers or consumers of goods and services").

Only a relatively small amount of bromine is sold commercially. Thus, only about 10% of overall bromine production is sold by producers to third parties. The bromine customers were unanimous in testifying in favor of this transaction. Mrs. Malmberg of duPont, a large bromine purchaser, testified that she favored the acquisition and believes it will be procompetitive. In her commercial judgment, it will leave three strong, aggressive competitors in the market—Dow, Ethyl and Great Lakes—and believes there will be no adverse impact on her ability to obtain adequate supplies at negotiated, rock-bottom prices. Indeed, from her viewpoint, putting Velsicol's capacity under Great Lakes' management will result in increased supply and further downward pressure on prices. (Malmberg Tr. 161).

Mrs. Malmberg testified that she preferred aggressive, reliable suppliers with overcapacity. (Malmberg Tr. 149). Presently, there are two such suppliers—Dow and Ethyl. Great Lakes, although aggressive and reliable, is operating at capacity. Velsicol, although saddled with tremendous overcapacity, is unreliable and not price competitive. The acquisition will increase the number of ideal suppliers from two to three. Having acquired Velsicol's brine fields, Great Lakes will be catapulted from a position of net buyer to one of overcapacity. (Malmberg Tr. 159–60). Thus, from the customer perspective, the acquisition is entirely procompetitive with respect to price and supply.

Other purchasers share Mrs. Malmberg's unqualified approval of the deal. (DX 5 (Heldt Aff. ¶¶ 6, 10); DX 6 (Green Aff. ¶ 10); DX 9 (Spottl Aff. ¶ 3); DX 19 (White Aff. ¶ 12)). They believe, to quote Dr. Heldt, President of Helix Associates, Inc.,

that the transaction "is in the best interest of Helix and other purchasers of elemental bromine." (DX 5 (Heldt Aff. ¶ 6)). In sum, bromine buyers see "only procompetitive benefits from the proposed acquisition," and "urge that it be permitted." (*Id.* at ¶ 10).

Substantial evidence has been introduced concerning Ethyl/Saytech's competitive relationship with Great Lakes and Velsicol. This evidence suggests that Ethyl/Saytech opposes the acquisition because it will *enhance*, not lessen, competition and will make it more difficult for Ethyl/Saytech to sell its brominated flame retardants. In this regard, the court takes note of *Brown Shoe's* admonition that the antitrust laws are to protect competition, not competitors. *Brown Shoe v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

(a) In 1980, Saytech competed head to head with Great Lakes with respect to at least 84% of Saytech's sales volume—Saytech 102 (52%), BN–451 (12%) and BLC 462 (20%). (DX 70 (Doelling Dep. 26–28)).

(b) Doelling testified that Great Lakes' purchase of Velsicol's flame retardant business will make Great Lakes a stronger competitor, and that it will be more difficult for Saytech to get sales in the marketplace. (DX 70 (Doelling Dep. 50)).

(c) Doelling testified that if Velsicol went out of business, Saytech would lose a competitor with respect to 30% of its 1980 sales. (DX 70 (Doelling Dep. 38)).

(d) Doelling testified that, in his commercial judgment and based on his experience in the industry, Great Lakes is an aggressive marketer of flame retardants in both the domestic and international markets (DX 70 (Doelling Dep. 69–70)).

Velsicol's bromine and fire retardant businesses are no longer competitive and have no prospect of again becoming competitive unless Great Lakes is allowed to acquire the facilities. Velsicol's bromine business is a failing company. The evidence establishes that Velsicol's bromine business has been hit hard by toxicological

and environmental problems; that demand for Velsicol's outmoded products has dropped off sharply and Velsicol's products have little commercial viability; that Velsicol has not and will not invest the required capital to repair bromine production towers and keep them operating; that plant production has fallen to such low levels that manufacturing costs exceed sales prices; that, in an industry where research and development is absolutely crucial, Velsicol is doing nothing in this area. Customers doubt Velsicol's reliability as a supplier and are turning away from important, longstanding commercial relationships for which Velsicol has no replacements.

█ Great Lakes has contracted to purchase only the bromine and flame retardant facilities of Velsicol, which together form a recognizable business unit independent of Velsicol's other operations. The "failing company" defense applies to a failing business such as Velsicol's bromine-based operations whether or not it is a division of a larger corporation which is successful in other areas. Justice Department Merger Guidelines, Par. 9. *United States v. Reed Roller Bit Co.*, 274 F.Supp. 573, 584 n. 1 (W.D.Okl.1967).

Velsicol's bromine operations have been registering increasing losses in the last several years. The income of the El Dorado business has declined continuously from a profit of $1.8 million in 1976 to a loss of $3.6 million in 1980 (DX 46), or, on an asset basis, a 1980 negative return of 11%. (DX 47). Velsicol has not made a profit on this bromine-based operation since 1976. Further, Velsicol's business plans through 1984 (which make the assumption that Velsicol stays in the bromine business) show losses for each year. (DX 50).

Velsicol's present financial crisis is rooted, in major part, in a series of toxicological and environmental disasters in the 1970's that have jeopardized Velsicol's ability to compete and stay in the bromine business. First, PBB, a brominated compound manufactured by Velsicol, was inadvertently mixed with cattle feed, which caused the contamination of farm animals and human food in the State of Michigan. (Beasley Tr. 435). The PBB contamination spawned a "tremendous" number of lawsuits, and $44 million has been paid out by Velsicol in injury claims. A $75 million lawsuit brought by the State of Michigan is still active. (Beasley Tr. 439). Velsicol no longer manufactures PBBs.

Second, Velsicol made the brominated flame retardant TRIS, which was applied to garment fabrics. Toxicological testing subsequently determined that TRIS was "potentially carcinogenic," and Velsicol was forced to cease manufacturing the product, at great expense. This cost Velsicol a second major market for its bromine. This incident likewise gave rise to a number of lawsuits by purchasers of TRIS products. (Beasley Tr. 438–39).

Third, at the same time opportunities in the bromine business were severely restricted by the demise of one of the largest uses for bromine derivatives, EDB additives for leaded gasoline. (Beasley Tr. 435).

Fourth, in September, 1978, Velsicol was forced to close its St. Louis, Michigan, plant, one of its principal bromine and bromine derivative product facilities, because it was "unable to obtain an operating permit from environmental authorities." (Beasley Tr. 439).

Velsicol has also suffered sharp declines in the demand for its current line of flame retardants, and Velsicol has not developed new commercial products with future promise. As a new line of products to replace EDB, PBB, and TRIS, Velsicol relied heavily on sales of PHT–4 and FM–680, which became the company's two principal commercial products.

With the 1978 shutdown of its St. Louis manufacturing plant, Velsicol lost its ability to make PHT–4. Because Velsicol was out of this market for approximately a year or so, competitors, and particularly Olin (with chlorinated RE–230), and Ethyl (with a brominated compound), gained Velsicol's abandoned market share. By the time Velsicol was able to build a new PHT–4 plant in El Dorado and re-enter the market, Velsicol

lost its previously enjoyed market acceptability.

Velsicol's market for FM–680, which is used in certain ABS applications, has diminished because of poor product performance. Because of this, the FM–680 is no longer competitive for many ABS applications. In fact, the commercial performance of FM–680 is so bad that Borg-Warner's use of the product has fallen far short of expectation, and Borg-Warner may well cancel the contract. (Beasley Tr. 442). Velsicol has not left a "single rock . . . unturned" in an effort to cure the problems with FM–680 (Beasley Tr. 443), but its efforts have failed. According to Beasley, the problems have had a "devastating" impact (Beasley Tr. 443) and Borg-Warner is cutting back on its demand for FM–680 and may cancel the contract.

Mr. Doelling of Ethyl shares defendant's conclusion that Velsicol is and has been an ineffective competitor. In his opinion, Velsicol has not been a strong competitor since the middle of 1978. He stated that Velsicol's problems with PBBs and TRIS had a "deleterious effect on [Velsicol's] image in the marketplace." (Doelling Dep. 16–17).

Velsicol has also suffered serious losses to its manufacturing efficiencies. The 1978 shutdown of the St. Louis plant, which extracted and produced bromine, cost Velsicol an important source of basic bromine. Velsicol has operated its El Dorado facility at far less than capacity since 1976, and plant utilization rates have continued to fall. In 1980, Velsicol's bromine production operated at a mere 36% of capacity, down from 78% in 1976. Velsicol's FM–680 production unit operated at only 67% of capacity in 1980, down from 97% in 1978. The PHT–4 unit operated at only 44% of capacity in 1980. (DX 45).

Not only is Velsicol's utilization of its plant capacity very low, but at the same time, the practical capacity of the plant (which is measured as the actual working capacity) is declining. This is because "demand for our product is so small that it's not economically feasible for us to repair the bromine towers, which, by their very nature, are used up in the process of producing bromine. . . . So we are not replacing capacity that is lost through attrition." (Beasley Tr. 447). Two bromine towers have ceased production because they have not been maintained. (Hartman Tr. 308). What this means is that, as a percentage of actual plant capacity (measured to include capacity that could be repaired and used), the utilization rates are lower than the figures indicate.

Important customers of Velsicol doubt the company's long-term viability as a reliable supplier, and have taken steps to sever important supply relationships. Mrs. Malmberg, duPont's bromine buyer, testified that she last year decided to terminate Velsicol's bromine supply contract because duPont had concluded that Velsicol was not a long-term supplier. When, after a grace period, Velsicol's performance had not improved, she formally terminated the contract. (Malmberg Tr. 150–52; DX 57). du-Pont was Velsicol's fourth largest overall customer in 1980, and second largest bromine buyer.

Donald LaTorre, general manager of BASF-Wyandotte's Styroper Division, testified that BASF concluded in 1980 that Velsicol is not a reliable long-term supplier of the HBCD that BASF purchases. As a consequence, BASF determined that several other domestic bromine-derivative manufacturers are capable of supplying HBCD, and BASF intends to renegotiate the present contract with Velsicol so BASF can buy from another domestic source. (LaTorre Tr. 234). BASF was Velsicol's second largest overall customer in 1980, and Velsicol's largest HBCD customer for that year. (DX 51).

Velsicol's largest flame retardant customer is Borg-Warner, which in 1980 purchased 52% of Velsicol's production, measured by poundage. (DX 51). Under contract, Borg-Warner purchases more than 95% of Velsicol's FM–680, the company's only remaining significant commercial product. (Beasley Tr. 445; DX 51). If Borg-Warner does not renew the FM–680 supply contract, "it will virtually wipe out the [FM–]680." (Beasley Tr. 448). In discussions with Velsicol about

the future of the contract, which expires in April, 1982, Borg-Warner has indicated that they will not renew the contract. A cancellation of the contract will deliver a "devastating blow" to the Velsicol plant because that is the "only product which...has sales price exceeding our costs to manufacture...." (Beasley Tr. 445). Mr. Sakach of Borg-Warner testified that cancellation of the contract is likely because Velsicol's FM–680 production problems have diminished Borg-Warner's ability to use the product in the marketplace.

Great Lakes is the only realistically available purchaser of Velsicol's bromine business. The meetings between Ethyl and Velsicol executives in early 1980 resulted in a recommendation by Ethyl's financial personnel that Ethyl not purchase Velsicol's bromine business because Velsicol's asking price (book value) was "much too high." Ethyl also concluded that "Velsicol's bromine plant and 'brine reserves are of questionable value to Ethyl.'"

Besides considering the FTC's likelihood of ultimate success, under Section 13(b), the court also must weigh the equities to determine whether the public interest could be served by a preliminary injunction. Here, significant public and private equities favor consummation of the proposed acquisition.

First, the transaction holds important benefits for Velsicol and its ultimate shareholders. It is a chance for them to salvage something from Velsicol's unsuccessful bromine-related operations and to focus their attention on Velsicol's other activities. It is exactly this type of shareholder interest which has been accorded substantial weight in prior Section 13(b) cases. *FTC v. Weyerhaeuser Co.*, 1981–1 Trade Cas. ¶ 63,974, pp. 76,047–48 (D.D.C.), *aff'd,* 665 F.2d 1072, 1981–2 Trade Cas. ¶ 64,263 (D.C.Cir.1981); *FTC v. Exxon Corp.*, 1979–2 Trade Cas. ¶ 62,972, p. 79–539 (D.D.C.1979), *aff'd,* 636 F.2d 1336 (D.C.Cir.1980).

Second, the acquisition will serve the national interest by promoting foreign trade. Great Lakes is an aggressive marketer of flame retardants internationally. Velsicol is not. Fully one-fourth of Great Lakes' sales are to foreign buyers. (Kampen). Great Lakes' international sales progress has been "exceptional" (FTC Ex. 16 at p. 5), and its "International Division may well prove to be the fastest growing of all." (FTC Ex. 28 p. 11). By contrast, Velsicol sells almost no bromine-related products abroad. Because Great Lakes plans to increase bromine-related sales abroad, the proposed transaction will result in increased exports and will benefit the nation's balance of payments and the economy as a whole. (DX 70 (Lyday Dep. 11)). In this regard, courts have recognized that the "stimulation of additional international...activity is procompetitive and beneficial." *United States v. Crocker-Anglo Nat'l Bank,* 277 F.Supp. 133, 195–96 (N.D.Cal. 1967). *See also United States v. Tidewater Marine Service, Inc.,* 284 F.Supp. 324, 342–43 (E.D.La.1968); *United States v. Standard Oil Co.,* 47 F.2d 288, 301 (E.D.Mo.1931).

Third, the proposed acquisition will encourage entry into the bromine-related business and other high risk businesses, by preserving reasonable opportunities to exit. It will clearly indicate to a potential entrant that if it enters the business, it will not be stuck in the industry forever if its ship starts to sink. Allowing the government to keep a company in the business against its will discourages other firms from getting in in the first place. In short, the government's no exit policy hinders competition, while a policy of reasonable exit promotes it.

Fourth, the acquisition will enhance critically needed research and development in the industry. Great Lakes is an acknowledged leader in research and development.

Fifth, the acquisition will benefit the local community of El Dorado, Arkansas. This point is established by affidavits by three leading citizens of El Dorado. (DX 15–17).

Sixth, the acquisition would alleviate Velsicol's poor financial condition. This equity—giving a company an opportunity to escape its dire financial straits—favors denial of the preliminary injunction. This equity has long been recognized in merger

cases and was found to be controlling in *United States v. G. Heileman Brewing Co.*, 345 F.Supp. 117, 122–24 (E.D.Mich.1972), where, as here, assertedly "preliminary" relief would have caused further and perhaps irreparable financial harm before an opportunity to litigate the merits of the FTC's claim.

The "preliminary" relief sought by the FTC would doom this transaction. Courts have long recognized that "the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated." *FTC v. Exxon Corp.*, 636 F.2d at 1343. As a consequence, the usual rule that a preliminary injunction is "an extraordinary and drastic remedy" is "particularly true in the acquisition and merger context." *Id.* at 1343.

Section 13(b) was not enacted to authorize automatic preliminary injunctions, but rather "was enacted for the purpose of preserving the ability of the Federal Trade Commission and the courts to order effective, ultimate relief upon completion of the proceedings [on the merits]." *FTC v. Exxon Corp.*, 1979–2 Trade Cas. ¶ 62,972 at p. 79,538 (D.D.C.1979), *aff'd*, 636 F.2d 1336 (D.C.Cir.1980). Whether a preliminary injunction is necessary to preserve that ability requires an analysis of "the factual circumstances of *this* case." *Id.* (emphasis added).

In *this* case, divestiture would be an effective ultimate remedy should the Commission succeed in its case on the merits. If the acquisition were permitted to go forward and Great Lakes was ultimately required to divest the Velsicol assets, competition would be improved, not lessened, because Great Lakes would be selling a more viable operation than presently exists.

For the foregoing reasons, the FTC's request for a preliminary injunction under Section 13(b) of the FTC Act is denied.