**FEDERAL TRADE COMMISSION, Plaintiff,**

v.

**ILLINOIS CEREAL MILLS, INC., Elders IXL Limited, and Elders Grain, Inc., Defendants.**

No. 88 C 4891.

United States District Court, N.D. Illinois, E.D.

July 18, 1988.

Ronald B. Rowe, Timothy T. Hughes, F.T.C., Chicago, Ill., David C. Shonka, Norris Washington, Patricia Shapiro, F.T.C., Washington, D.C., for plaintiff.

James H. Sneed, David Marx, Jr., Lizbeth Levinson, McDermott, Will & Emery, Chicago, Ill., for defendant Illinois Cereal Mills, Inc.

Kael B. Kennedy, Kirk D. Messmer, Matkov, Salzman, Madoff & Gunn, Chicago, Ill., Eugene Meigher, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for defendant Elders.

## MEMORANDUM ORDER

BUA, District Judge.

Before this court is plaintiff's motion for preliminary relief under § 13(b) of the Federal Trade Commission Act and plaintiff's motion for reconsideration of this court's denial of leave to file an amended complaint to add a claim under the Hart–Scott–Rodino Act. For the reasons stated herein, plaintiff's motion for reconsideration of leave to file a Hart–Scott–Rodino Act claim is denied, but plaintiff's motion for preliminary relief in the form of injunction ordering rescission of the consummated acquisition of Lincoln Grain Company's assets by defendant Illinois Cereal Mills, Inc., from defendant Elders Grain, Inc., is granted subject to conditions described below.

## FINDINGS OF FACT

### I. *Background*

1. Defendant Illinois Cereal Mills, Inc., ("ICM") is a Delaware corporation having its principal place of business in Illinois. (Plaintiff's Exhibit ("PX") 1.) ICM owns and operates industrial dry corn mills in Indianapolis, Indiana and Paris, Illinois. (*Id.*) Defendant Elders Grain, Inc., ("Elders") is a wholly owned subsidiary of Elders IXL, Ltd., an Australian corporation, and is licensed to do business in Illinois. (PX 2.) Elders owns and operates the Lincoln Grain Company ("Lincoln") in Atchison, Kansas. (*Id.*) Lincoln is also an industrial dry corn mill. (*Id.*)

2. In early June 1988, ICM purchased certain dry corn milling assets of Lincoln from Elders. (*See* PX 45–49.) According to the purchase agreement, ICM acquired a dry corn mill and approximately 90 rail cars for $14 million. (*See* PX 45.) In addition, ICM procured a five-year option for $100,-000 to purchase a 21–million–bushel grain elevator located adjacent to the dry corn mill and entered into an agreement to lease one sixth of the space in the elevator for $250,000 a year plus handling charges. (*See* PX 46–49.)

3. On June 6, 1988, plaintiff Federal Trade Commission ("Commission") instituted the present action seeking either rescission of the Lincoln asset sale or the appointment of a receiver to operate and manage the acquired assets pending the outcome of administrative litigation before the Commission. (*See* Complaint.) Elders' parent company, Elders IXL Ltd., was initially named in the complaint as a defendant but was later voluntarily dismissed by the Commission.

4. The complaint alleges that ICM's purchase of Lincoln's dry corn milling assets violates § 7 of the Clayton Act, 15 U.S.C. § 18, and § 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, because the acquisition may substantially lessen competition or tend to create a monopoly in the relevant product and geographic markets. (Complaint at ¶ 12.) The complaint alleges the relevant product market consists of all major products produced by dry corn milling for food use and defines the relevant geographic market as the United States. (*Id.* at ¶ 13.) The complaint asserts that the Lincoln asset acquisition may substantially lessen competition in the relevant markets by eliminating actual and potential competition between ICM and Elders and facilitating anticompetitive interdependent conduct among remaining competitors in the dry corn milling business. (*Id.* at ¶ 14.) The effect of the foregoing conditions, according to the complaint, increases the likelihood that competitors will increase prices and decrease output both in the near future and long term. (*Id.*) The complaint avers that the re-establishment of Lincoln as a viable independent competitor after the conclusion of administrative litigation poses serious if not insurmountable difficulties and a strong likelihood of substantial interim harm to competition exists if the sale is not enjoined or rescinded. (*Id.* at ¶ 15.) Asserting that the Commission possesses a substantial likelihood of success on the merits and the entry of preliminary relief is in the public interest, the complaint requests a preliminary injunction pursuant to § 13(b) of the FTC Act, 15 U.S.C. § 53(b), rescinding the sale of Lincoln's milling assets by Elders to ICM or appointing a receiver to manage the assets as an independent concern pending administrative litigation before the Commission.

5. Chief Judge Grady, sitting as emergency judge, denied the Commission's motion for a temporary restraining order on June 6, 1988. (*See, FTC v. Illinois Cereal Mills*, No. 88 C 4891 (N.D.Ill. June 6, 1988).) Hearings on the Commission's motion for a preliminary injunction were scheduled for June 9 and 10. The morning of June 9, prior to presenting its case-in-chief, the Commission moved to amend its complaint to add a claim under the Hart–Scott–Rodino Act ("HSR Act"), 15 U.S.C. § 18a(g)(2). Under its proposed § 18a(g)(2) claim, the Commission sought rescission of the noted asset sale on the grounds that defendants failed to comply with the preacquisition notice and waiting requirements of the HSR Act because the actual value of the Elders–ICM transaction exceeded the Act's $15 million reporting threshold. Because permitting the proposed amendment would have necessitated additional discovery and resulted in delay of the hearing, the Commission's motion to file an amended complaint was denied. (*See FTC v. Illinois Cereal Mills*, No. 88 C 4891 (N.D. Ill. June 9, 1988).)

6. After receiving testimony, exhibits and written arguments from the parties, this court issued a minute order on June 14, 1988, granting the Commission's motion for rescission of the acquisition pending administrative litigation. (*See FTC v. Illinois Cereal Mill*, No. 88 C 4891 (N.D.Ill. June 14, 1988).) However, the rescission order was stayed pending appeal of this court's decision to the Seventh Circuit. (*Id.*) During the interim period, the terms of an agreed hold separate order were to apply. (*Id.*) The Commission's motion for reconsideration of its motion to amend its complaint adding HSR Act claims, however, was denied. (*Id.*) Finally, it was indicated that a memorandum order containing findings of fact and conclusions of law would follow. (*Id.*)

## II. *Dry Corn Milling Industry*

7. The dry corn milling industry is composed of two segments, each of which serves a different type of customer. (PX 1 at ¶ 4.) "Industrial" dry corn mills typically process yellow corn into a variety of products used by food producers who manufacture a wide spectrum of food products for resale to the public. (*Id.*) "Consumer" dry corn mills process mostly white corn into products packaged for consumption by the general public. (*Id.*)

8. An industrial dry corn mill removes the outer covering or "bran" of the corn and separates the soft portion or "germ" from the remainder of the kernel. (PX 1 at ¶ 4; Tr. at 123.) Further processing reduces certain parts to "grits," while other parts are ground into meal and flour. (PX 1 at ¶ 4.) The milling process ultimately produces three classes of products: prime products, hominy feed, and corn oil. (*Id.*)

9. Prime products, listed in decreasing order of size, include flaking grits, brewer's grits, corn meal, and corn flour. (PX 1 at ¶ 5.) Prime products derive from the degermed portion of the kernel. (*Id.*) Flaking grits, the largest particles produced in the milling process, are used in the manufacture of corn flakes for breakfast cereal. (*Id.*) Brewer's grits, the second largest particle size produced, are used in the process of brewing beer. (*Id.*) Corn meal and corn flour, the third and fourth largest size particles, are used in a variety of food applications such as baking mixes, snacks, and cereals. (PX 1 at ¶¶ 5, 10.) Some industrial dry corn mills further process the granulations and produce products such as pregelatinized corn flour ("pregel"), used in the manufacture of certain cereals, and corn/soya/milk ("CSM"), which is purchased by the United States Government for use in various PL480 feeding programs in foreign countries. (PX 1 at ¶ 14.)

10. Hominy feed and corn oil are considered by-products of the milling process. Corn oil is extracted from the germ of the corn after being severed from the kernel and is used in the manufacture of margarine and as a cooking oil. Hominy feed is a collection of unused portions of the processed corn and is sold as livestock food. (PX 1 at ¶ 6.)

11. Whenever a corn miller attempts to make grits of a particular particle size, the miller not only gets that size, but also a series of smaller grit particles with some meal and flour. (PX 1 at ¶ 5.) Generally, those prime products most difficult to make, such as flaking grits, command the highest price while smaller particle products, such as meal or flour, bring the lowest prices. (PX 1 at ¶ 12.)

## III. *Relevant Product Market*

12. With few exceptions, industrial dry corn mills can reconfigure their processing equipment to produce all prime products used by food processors. (PX 1 at ¶¶ 11, 15; PX 4 at ¶¶ 7, 12; PX 8 at 1; Tr. at 71–75, 86.)

13. Six industrial dry corn milling concerns produce over 90 percent of all relevant prime products sold in the United States: (1) Bunge Corporation ("Bunge"), with facilities in Danville, Illinois and Crete, Nebraska; (2) J.R. Short Milling Company in Kankakee, Illinois ("J.R. Short"); (3) Archer Daniels Midland Company in Shawnee Mission, Kansas and Milwaukee, Wisconsin ("ADM"); (4) Quaker Oats Company in Cedar Rapids, Iowa ("Quaker Oats"); (5) Elders' Lincoln Grain Company in Atchison, Kansas; and (6) ICM in Paris, Illinois, and Indianapolis, Indiana. (PX 1 at ¶ 16; PX 4 at ¶ 9, PX 31; Tr. at 12–14, 29, 71, 82.)

14. The industrial dry corn milling industry is presently operating in a state of substantial excess capacity. (PX 1 at ¶ 15; PX 4 at ¶ 15.)

15. Consumer dry corn mills relative to industrial mills are small in size and produce corn meal and corn flour products which are not degermed. The germed products produced by consumer mills are typically packaged in five- to ten-pound bags and sold in grocery stores. Purchasers of industrial milled prime products cannot use germed corn products because an adverse effect on the quality of the final product produced would result. Industrial

dry corn millers and customers do not consider the products produced by consumer mills as adequate substitutes for industrial milled prime products. (PX 1 at ¶ 4; PX 4 at ¶ 10; Tr. 19–20, 27, 76.)

16. Consumers using prime products produced by industrial dry corn mills generally cannot shift to other products in response to a small but significant nontransitory price increase. A sustained ten-percent price increase of prime products would not induce product substitution to any appreciable degree. (PX 1 at ¶ 10; PX 22 at ¶ 18; PX 24 at ¶ 6; Tr. at 10, 28–29, 45, 73–75.) The unique texture, taste, "mouth feel," and other qualities of dry milled prime products simply cannot be duplicated by another grain or food product. (PX 1 at ¶ 10.)

## IV. Relevant Geographic Market

17. Major industrial dry corn mills are located in or near the corn belt states of Indiana, Illinois, Iowa, Kansas, and Nebraska. Most large industrial mills operate a series of country grain elevators where corn is purchased directly from farmers and stored for use by the mills. Location of the industrial mills and the elevators in corn producing areas allows dry millers to avoid purchasing corn from commercial terminal elevators where the particular quality of corn needed for dry milling is difficult to guarantee. (PX 1 at ¶ 4.) To ensure only top quality corn is used, industrial mills attempt to control the corn from its acquisition from the farmer to arrival at the mill. (Id.)

18. Access to railroad lines is also an important factor in the success of an industrial mill. (PX 1 at ¶¶ 17, 18.) Although major industrial mills ship some of their product by truck, the majority of industrial dry corn products are shipped by rail. (PX 1 at ¶ 18.) Rail shipments can take any one of three forms. Depending on the needs and location of the particular customer, products may be packaged in bags of 100 pounds or more and shipped by box car or piggyback. In other cases the products are shipped bulk in hopper cars. (PX 26; PX 28; PX 30.)

19. Shippers incur a penalty or surcharge each time a "break" in the railroad system occurs, or each time a rail car must be transferred from one rail carrier to another. (Tr. at 128–29.) Although breaks result any time a shipper is unable to reach a desired destination on one rail line, the Mississippi River, by virtue of geographic divisions in the rail industry, is commonly where a break occurs. (Tr. at 131.) Thus, with few exceptions, shippers generally incur a freight penalty each time the Mississippi River is crossed. (Id.)

20. The average cost of a break in a rail shipment is equal to about two to four percent of the delivered price of the product shipped. (PX 41; Tr. at 131–32.)

21. Shipment patterns of industrial mills reveal that substantial quantities of dry milled corn products travel across the Mississippi River. Elders' Lincoln mill ships over nine percent of its production of prime products east of the Mississippi River; Bunge's Danville, Illinois mill ships 61 percent of its flaking grit production west of the Mississippi River; Bunge's Crete, Nebraska dry corn mill ships 61 percent of "other grits and meal" east of the Mississippi River; ADM Milling, in Milwaukee, Wisconsin ships 17 percent of all of its dry milled corn products west of the Mississippi River; and J.R. Short, in Kankakee, Illinois ships over 36 percent of its brewer's grits production west of the Mississippi River. (PX 1 at ¶ 20; PX 31; Tr. 105–06, 114–15, 164.) In contrast, ICM ships only 1 percent of its production west of the Mississippi River. (See PX 1 at ¶ 8; PX 31; Tr. at 164–65.)

22. Buyers and sellers in the industrial dry corn industry perceive that all large industrial mills are significant competitors in a market that spans both east and west of the Mississippi River. (PX 2 Spec. 2 at 5, 9, 14, 18, Spec. 3 at 1; PX 4 at ¶ 9; PX 6 at 49–51, 69; PX 26 at 4; PX 28 at Schedule H; PX 39; Tr. 32–37, 48–49, 77–81, 113–15.)

23. Elders and ICM have identified each other as "principal competitors," and each ships products into several states served by the other. (See PX 1 at ¶ 16; PX 2; PX 3;

PX 6 at 51; PX 26 at 4; *but cf.* PX 1 ¶ 8.) ICM and Elders bid to supply corn meal for USDA programs to the same locations east of the Mississippi River. In many cases, Elders' Lincoln mill bids lower than ICM in the east. (PX 3 at 84; Tr. at 184.)

24. Elders advertises that it markets its dry corn products on a nationwide basis. (PX 16; PX 39.) Presently, Elders ships its products to over 18 states east of the Mississippi River. (PX 2 Spec. 3 at 1.) In addition, Elders identifies over 19 ICM customers as prospective new customers. (PX 12; Tr. 105.)

25. The Sales Staff Supervisor for Elders' Lincoln mill testified at a Commission investigative hearing that he perceived ICM to be a "major competitor." (PX 6 at 48, 69.) Lincoln's Traffic Manager testified at a Commission investigative hearing that Lincoln served customers in the east and estimated that 30 to 40 percent of Lincoln's shipments went to locations east of the Mississippi River. (PX 5 at 35; *see also* PX 31.)

26. The *Staggers Rail Act of 1980*, 49 U.S.C. § 10101a note deregulating the rail and trucking industries, has made negotiated transportation rates for long distance rail and truck shipments the norm in the dry corn milling industry. (*See* PX 5; PX 28; PX 41; Tr. at 78–81; 181–87.)

27. Buyers of industrial milled prime products located in the east indicate that a ten-percent increase in price by mills situated east of the Mississippi would induce them to increase purchases from western mills. (Tr. at 10, 32–33, 44–49.)

28. Likewise, a significant but nontransitory price increase by western mills to customers west of the Mississippi would result in increased shipments from eastern mills. (PX 41.)

29. Notwithstanding the foregoing, an internal memorandum prepared by an FTC lawyer in connection with Bunge's attempt to purchase Lincoln from Elders in May 1988, discusses tentative national and western markets for dry corn mill products. (Defendant ICM's Exhibit ("DX") 3.)

## V.  *Competitive Effects*

30. ICM is the second-largest industrial dry corn mill operator in the United States. (PX 19.) The acquisition of dry corn milling operations of Elders represents an acquisition of the fifth-largest industrial dry corn mill operator in the United States. (PX 19.) The transaction combines two of only six significant industrial dry corn millers in the United States. (PX 19.)

31. Two methods of measuring industry concentration exist for purposes of merger analysis. The first is the four-firm concentration ratio. The second, which is set forth in the Department of Justice *Merger Guidelines*, 2 Trade Reg.Rep. (CCH) ¶ 4500 *et seq.* (1982) ("Merger Guidelines"), is the Herfindahl–Hirchman Index ("HHI"). (Tr. 66–67.)

32. The four-firm concentration ratio method adds the shares of the top four firms in a given product and geographic market. (Tr. at 67.) Assuming that the relevant product market is all industrial milled prime products and the relevant geographic market is the United States, the postacquisition four-firm concentration ratio increases from 79 percent to 88 percent. (PX 19.) Thus, the increase in concentration resulting from ICM's acquisition of Lincoln's milling assets is 9 percent. (*Id.*) Additionally, the acquisition elevates ICM's market share from 23 percent to 32 percent. (*Id.*)

33. The HHI is premised upon the economic principle that both the distribution of market shares among the leading firms and the composition of the market outside of the leading firms are significant in assessing the likelihood of tacit collusion or interdependent, noncompetitive conduct in a market.[1] The fewer the number of firms,

---

1. The Herfindahl–Hirschman Index, or HHI, is a measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of three firms with shares of 50, 30, and 20 percent each, the HHI is 3800 ($50^2 + 30^2 + 20^2 = 3800$). The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is served by a large number of firms of relatively equal size, and reaches its maximum of 10,000

the easier a collusive arrangement can be achieved. *See Merger Guidelines, supra,* Para. 4493 at 6879-13. Markets with HHI below 1000 are generally characterized as "unconcentrated," while markets with HHI between 1000 and 1800 are "moderately concentrated" and markets with HHI in excess of 1800 are "highly concentrated." *Id.* (Tr. at 68-69.)

34. Again assuming the relevant product and geographic markets are all industrial milled prime products sold in the United States, the postacquisition HHI is 2606. (PX 19.) This represents an increase of 480 over the preacquisition HHI of approximately 2100 (PX 19; Tr. at 82.)

35. Industrial dry corn mills are expensive to build and, if they fail, have little salvage value. (PX 1 at ¶ 18.) Entry into the industrial dry corn milling industry requires the construction of a large facility to economically compete with existing firms. (PX 1 at ¶ 17; PX at ¶ 17; PX 22 at ¶ 9; Tr. at 84, 134-35.) Recent experience has shown that a new entrant cannot successfully penetrate the market without first securing substantial contracts to minimize the risk. (PX 22.) Because a new manufacturer is not likely to find the necessary sales volume prior to constructing a mill facility, *de novo* entry into the industrial dry corn milling industry is unlikely. (Tr. at 134-35.) Even in the event of a small but significant increase in price for a non-transitory period of time, prospects for entry into the industrial dry milling industry are remote. (Tr. at 83, 134-35.)

36. Elders acquired Lincoln in August 1987. As part of the transaction, Elders acquired Lincoln's mill facility in Atchison, Kansas and numerous grain elevators located in the midwest. (Defendant Elders' Exhibit ("DEX") 1 at ¶ 2.) Elders considers the dry corn mill assets to represent only ten percent of the total cost of the Lincoln acquisition. (DEX 1 at ¶ 3.) At the time it purchased Lincoln, Elders possessed no experience in operating an industrial dry corn mill and did not intend to retain the milling facilities for any appreciable period of time. (*Id.*) Since acquiring Lincoln, several key management personnel of the mill have left the company. Elders has filled these vacancies with prior Lincoln employees possessing little experience in the management of a dry corn mill. (DEX 1 at ¶ 5.)

37. Lincoln presently ships over 90 percent of its prime products to customers located west of the Mississippi River (DX 9.)

38. ICM is generally regarded as an efficient technologically innovative producer of dry corn milled products. (DX 11 at ¶ 5.) ICM intends to implement certain modifications in the Lincoln mill which are expected to result in significant cost savings and allow the Lincoln facility to compete more effectively for business in the western United States. (DX 11 at ¶ 5.)

39. To the extent that any of the foregoing findings of fact are deemed to be conclusions of law, they are hereby adopted as conclusions of law.

## CONCLUSIONS OF LAW

### I. *Jurisdiction*

1. Jurisdiction is conferred on this court by § 13(b) of the FTC Act, 15 U.S.C. § 53(b). Venue is proper in this district under § 13(b) of the FTC Act and 28 U.S.C. § 1391(c). Elders and ICM are engaged "in commerce," as defined in § 4 of the FTC Act, 15 U.S.C. § 44, and § 1 of the Clayton Act, 15 U.S.C. § 12.

### II. *Commission's Motion to Add a HSR Act Claim*

2. The Commission seeks to amend its complaint against defendants to include a claim under the HSR Act, 15 U.S.C. § 18a. The HSR Act provides that before stock or asset acquisitions of a particular size can be consummated, both the prospective sellers and purchasers must comply with certain reporting and waiting requirements. 15 U.S.C. § 18a(a)-(b). The purpose of the HSR Act is to provide the

---

when a single supplier exists in the market. The HHI increases both as the number of firms in the market decreases and as the disparity in size among those firms increases. *See Merger Guidelines, supra,* at ¶ 4493.

Commission and the Department of Justice with information and time necessary to determine whether a proposed transaction, if consummated, may violate antitrust laws.

3. The statutory coverage of the HSR Act turns on three tests, all of which must be satisfied before the Act applies. First, one of the parties must be engaged in commerce or in activities affecting commerce. 15 U.S.C. § 18a(a)(1). Second, the parties must meet the size-of-person test set forth in 15 U.S.C. § 18a(a)(2). Third, the size of the transaction must exceed one of two specified thresholds. 15 U.S.C. § 18a(a)(3). One such threshold is passed when the total amount of securities or assets acquired exceeds $15 million. *Id.*

4. The parties agree that applicability of the Act to the Lincoln acquisition turns on whether the third test set forth in § 18a(a)(3)(B) is met. The Commission essentially contends that the purchase-lease-option agreement between Elders and ICM is a sham and that the actual value of the Lincoln asset acquisition exceeds the $15 million threshold. Elders and ICM argue, however, that legitimate business reasons existed for structuring the transaction in the manner in which it was consummated. Moreover, Elders and ICM vigorously contest the Commission's position that procuring an option to purchase an asset should be viewed as acquiring the asset for purposes of HSR Act compliance.

5. As indicated earlier, the Commission's motion for leave to amend its complaint was denied on June 9, 1988. The basic rationale for this court's ruling stemmed from the fact that permitting the proposed amendment would have required postponement of the preliminary injunction hearing to allow defendants adequate time for discovery and preparation. Elders and ICM did not receive notice of the Commission's intent to add a HSR Act claim until the very eve of the scheduled preliminary injunction hearing. Thus, prejudice to ICM and Elders would have resulted if the HSR Act amendment was allowed and the pre-

liminary hearings were not delayed. Considering the foregoing factors and both sides' interest in prompt determination of the Commission's motion for preliminary relief under § 13(b) of the FTC Act, this court determined that allowing the Commission to amend its complaint the morning of the scheduled preliminary injunction hearing was inappropriate.

6. Nothing contained in the Commission's motion for reconsideration persuades this court to the contrary. As earlier indicated, the Commission has succeeded in obtaining preliminary relief on its claim that the Lincoln asset sale is likely to lessen competition or tend to create a monopoly in the markets for industrial milled prime products in the United States. Thus, even if the Commission had obtained leave to file its amended complaint and had succeeded in proving a HSR violation, it would have been entitled to no relief greater than that awarded under its § 13(b) claim. As such, the Commission's motion for reconsideration of its motion to amend its complaint is denied.[2]

### III. *Standards for Preliminary Relief Under § 13(b) of the FTC Act*

7. The Commission is empowered under § 13(b) of the FTC Act, 15 U.S.C. § 53(b), to seek preliminary relief pending the completion of administrative proceedings challenging a merger or acquisition. Because preliminary injunctive relief is an "extraordinary and drastic remedy," *FTC v. Great Lakes Chemical Corp.*, 528 F.Supp. 84, 86 (N.D.Ill.1981), such relief is granted only upon a showing by the Commission that a substantial likelihood of success on the merits exists, that preliminary injunctive relief is the only available means of ensuring the availability of a final remedy, and that the public interest favors the issuance of preliminary relief. *See FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1076 (D.C.Cir. 1981); *United States v. Coca-Cola Bottling Co. of Los Angeles*, 575 F.2d 222, 226 (9th Cir.), *cert. denied sub nom.*, *Aqua Media, Ltd. v. United States*, 439 U.S. 959,

---

**2.** In reaching this conclusion, however, this court expresses no opinion on the merits of the Commission's proposed amendment.

99 S.Ct. 362, 58 L.Ed.2d 351 (1978); *FTC v. Great Lakes Chemical Corp.,* 528 F.Supp. at 87.

8. To demonstrate a likelihood of success on the merits, the Commission must prove:

not that the merger in question may possibly have an anti-competitive effect, but rather that it will probably have such an effect. And the Government must have demonstrated at this stage in the case a likelihood that it can meet this burden.

*FTC v. Great Lakes Chemical Corp.,* 528 F.Supp. at 86.

9. Because a preliminary injunction blocking or rescinding an acquisition will often spell doom for the transaction, the Commission must establish that the preliminary injunction sought is necessary to ensure the availability of an effective final remedy and that divestiture after the completion of proceedings on the merits would not provide suitable relief. *FTC v. Great Lakes Chemical Corp.,* 528 F.Supp. at 99.

10. In addition to the foregoing, the Commission must show that the equities favor issuing the relief sought. 15 U.S.C. § 53(b). Essentially, this requires the Commission to establish that the harm to the parties and to the public resulting from the preliminary injunction is outweighed by any harm to competition that would occur in the period between denial of a preliminary injunction and a final adjudication on the merits. *FTC v. Great Lakes Chemical Corp.,* 528 F.Supp. at 86.

IV. *Likelihood of Success Under § 7 of the Clayton Act and § 5 of the FTC Act*

11. The Commission attacks ICM's acquisition of Lincoln's dry corn milling assets from Elders under § 7 of the Clayton Act, 15 U.S.C. § 18, and § 5 of the FTC Act, 15 U.S.C. § 45. Section 7 of the Clayton Act prohibits a corporation engaged in commerce from acquiring the assets of another corporation engaged in commerce where such acquisition may substantially lessen competition or tend to create a monopoly in a particular line of commerce in any section of the United States. 15 U.S.C. § 18. Section 5 of the FTC Act makes all unfair methods of competition and unfair or deceptive acts or practices in commerce unlawful. 15 U.S.C. § 45. Any act or practice which is prohibited by antitrust laws is viewed as an unfair method of competition under § 5 of the FTC Act. *See FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 2016, 90 L.Ed.2d 445 (1986).

12. The Commission's complaint asserts that ICM's purchase of Lincoln's dry corn milling assets may substantially lessen competition or tend to create a monopoly in the market for industrial milled prime products in the United States. Thus, the Commission premises its § 5 claim on an alleged violation of § 7 of the Clayton Act. Accordingly, the requirements for demonstrating a § 7 violation must be addressed before assessing whether the Commission has shown a likelihood of success on the merits.

13. To ultimately succeed on its Section 7 claims, the Commission must first establish the relevant product and geographic markets and then prove that the effect of the acquisition may substantially lessen competition within those markets. *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962).

A. Relevant Product Market

14. In *Brown Shoe Co.,* the Supreme Court outlined a two-step process for product market analysis. First, the outermost boundaries of a product market are identified by determining reasonable interchangeability of use or cross-elasticity of demand between the product itself and substitutes for it. *Id.* at 325, 82 S.Ct. at 1523. *See also United States v. Continental Can Co.,* 378 U.S. 441, 447–49, 84 S.Ct. 1738, 1741–43, 12 L.Ed.2d 953 (1964); *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 394–95, 400–01, 404, 76 S.Ct. 994, 1006–07, 1009–10, 1012, 100 L.Ed. 1264 (1956) (cross-elasticity of demand measures how far buyers will go to substitute one commodity for another). After the outer boundaries of a product market are defined, further analysis is required to determine whether well-defined submarkets

exist which, by themselves, may constitute separate product markets for antitrust purposes. *Brown Shoe Co.*, 370 U.S. at 325, 82 S.Ct. at 1523. The boundaries of such individual product markets may be determined by examining such practical indicia as "industry or public recognition of the submarket as a separate economic entity, the product's particular characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* The overriding principle in this two-step analysis is to identify meaningful competition where it actually exists. *United States v. Continental Can Co.*, 378 U.S. at 449, 84 S.Ct. at 1743.

15. In *Brown Shoe Co.*, the Supreme Court also noted that cross-elasticity of supply or production substitutability may also play a role in defining product markets for antitrust analyses. *Brown Shoe Co.*, 370 U.S. at 325 n. 42, 82 S.Ct. at 1524 n. 42. The cross-elasticity of supply refers to the capability of other production facilities to be converted to produce a substitutable product. *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C.Cir.1986).

16. Evidence presented by the Commission shows that industrial dry corn mills possess the ability to configure their operations to produce all prime products used by food processors. *See* Findings of Fact ("FF") ¶ 12, *supra.* Thus, the simple fact that certain industrial mills do not currently produce each type of prime product presently marketed does not alter the analysis of which firms should be included in assessing the cross-elasticity of supply.

17. Six firms capable of manufacturing the relevant products produce over 90 percent of the prime products sold in the United States. *See* FF ¶ 13, *supra.* These firms are Bunge, ICM, ADM, Quaker, Elders (Lincoln), and J.R. Short. *Id.* A number of smaller dry corn mills with extremely limited output capacities supply the remaining prime products sold in the United States. *Id.*

18. Consumer dry corn mills compared to industrial dry corn mills are considerably smaller and typically do not possess facilities for manufacturing degermed corn products. *See* FF ¶ 15, *supra.* Thus, they are not viewed as potential suppliers of prime products.

19. Consumers using prime products produced by industrial mills cannot shift to other products in response to a small but significant nontransitory price increase. *See* FF ¶ 16, *supra.* Testimony of purchasers of prime products reveals that a sustained ten-percent increase in the price of prime products would not induce product substitution to any appreciable degree due to the particular qualities dry milled corn adds to their food products. *Id.* Because the use of germed corn products by food processors adversely affects the quality of the food products they produce, food processors do not consider the products manufactured by consumer mills as being viable substitutes for industrial milled prime products. *See* FF ¶ 15, *supra.*

20. Applying the principles of cross-elasticity of supply and demand to the facts in the present case, this court determines that the relevant product market consists of all prime products for food use produced by industrial dry corn mills. Although the Commission also believes that each type of prime product constitutes a separate product submarket, the Commission's evidence and arguments essentially embrace the theory that the broader market definition of all prime products is the proper "line of commerce" for purposes of § 7 analysis. Accordingly, this court's discussion will focus on the effect the challenged acquisition is likely to have on competition in the market for industrial milled prime products.

B. Relevant Geographic Market

21. In addition to defining a relevant product market, § 7 requires a determination of the effects the acquisition is likely to have on a section of the country or relevant geographic market.

22. In the present case, the parties are sharply divided on the proper definition of the relevant geographic market. The Commission takes the position that a national market for industrial milled prime products exists. Elders and ICM, however, assert

that the Mississippi River marks a sharp delineation between separate eastern and western markets for industrial milled prime products. They contend that producers in the east and west are unable to significantly compete with each other because of special transportation costs incurred when shipping goods by rail over the Mississippi River.

23. According to the Court's opinion in *Brown Shoe Co.*, the geographic market selected must correspond to the "commercial realities of the industry and be economically significant." *Brown Shoe Co.*, 370 U.S. at 336–37, 82 S.Ct. at 1530. The inquiry employed under this standard does not focus on where the parties to an impending merger or acquisition do business or where they presently compete, but rather it focuses on where, within the area of competitive overlap, the effect of the merger or acquisition on competition will be direct and immediate. *United States v. Philadelphia Nat'l. Bank*, 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963). Simply stated, the question centers on where sellers operate and where purchasers can practicably turn for supplies. *United States v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 357–58, 90 S.Ct. 2035, 2040, 26 L.Ed.2d 658 (1970). The scope of the relevant geographic market includes the area in which sellers of the relevant product can increase price or cut output without triggering a flow of supply into the area from outside it. *See RSR Corp. v. FTC*, 602 F.2d 1317, 1323 (9th Cir.1979).

24. Applying the foregoing analysis to the facts in the present case compels the conclusion that a nationwide geographic market for prime products exists: All producers are located relatively close to one another, they ship their products nationally, customers look to each of them for supplies and producers consider each other to be competitors. *See* FF ¶¶ 21–28, *supra.*

25. Elders and ICM's contention that separate eastern and western geographic markets exist rests on the assertion that freight penalties incurred when crossing the Mississippi River make such shipments cost prohibitive. Because shipments across the Mississippi River typically involve a break in rail service requiring the services of a second railroad at a special premium, Elders and ICM contend that mills located on opposite sides of the Mississippi are unable to effectively compete with each other. Defendants contend that ICM's own shipment patterns are indicative of this barrier to nationwide competition and that statements by other industrial mills support the existence of separate eastern and western geographic markets. Additionally, Elders and ICM note that an internal memorandum prepared by a Commission attorney in connection with Bunge's unsuccessful attempt to acquire Lincoln in June 1988 recognizes a western geographic market for prime products.

26. Elders and ICM's arguments, however, fail to convince this court that separate geographic markets for industrial milled prime products exist on each side of the Mississippi. First, under Elders and ICM's theory, producers are limited to competing for customers that are located in areas where single-line rail shipments are possible. An examination of shipment records for several industrial mills reveals that even when shipping products to locations on the same side of the Mississippi, multiple rail services frequently are employed. *See e.g.*, PX 26 at Ex. 3; PX 28 at Ex. F; PX 30 at Ex. IV. Although ICM's Paris, Illinois mill is only serviced by Conrail, eastern shipments from its Paris facility commonly involve two or more railroads. *See* PX 2 at Ex. 3. Thus, breaks in rail service are commonly encountered when shipping goods to all areas of the nation, not just those instances when the Mississippi River is crossed.

27. Elders and ICM's argument concerning freight barriers is also undercut by the current shipping practices of most industrial mills. Although ICM currently rail ships only one percent of its products to locations west of the Mississippi River, rail shipment patterns of other major industrial mills indicate that ICM is atypical. Most major industrial mills rail ship substantial amounts of their prime products

across the Mississippi River. *See* FF ¶ 21, *supra.*

28. Though mills west of the Mississippi tend to ship most of their products to western locations and mills east of the Mississippi tend to ship to eastern locations, the fact remains the nearly all major industrial mills compete for customers on a national basis. All major industrial mills consider each other principal competitors, and consumers view industrial mills on both sides of the Mississippi as viable suppliers of prime products. *See* FF 22–23, *supra.* Customers buying prime products from producers east of the Mississippi would, in the face of a sustained ten-percent price increase by eastern mills, turn to western producers for their purchases. *Id.* This type of response indicates that regional price increases are likely to fail and that the market which buyers are able to turn for prime products is national in scope. Thus, the fact that ICM presently ships only one percent of its prime products west of the Mississippi does not dictate that two geographic markets exist.

29. ICM and Elders attempt to support their assertion of separate eastern and western markets with citations to statements by various producers concerning their perceived competitors. First, testimony by ICM's chief executive officer and president is highlighted to underscore that freight penalties limit eastern producers, like ICM, from competing for business west of the Mississippi. Next, ICM and Elders note statements by the presidents of J.R. Short and Agricor, Inc., a small industrial dry corn mill in Marion, Indiana, which purportedly support the existence of two geographic markets.

30. Careful scrutiny reveals, however, that during the Commission's investigation of Bunge's proposed acquisition of Lincoln from Elders, ICM submitted statements to the Commission which listed Bunge's mill in Crete, Nebraska and Elder's mill in Atchison, Kansas as being among its "principle competitors." *See* PX 26 at 4. Similarly, the president of J.R. Short listed all major western mills as primary competitors in his report to the Commission. *See* PX 30 at ¶ 9. The portion of the president's report highlighted by defendants simply states that J.R. Short's area of competition with competing producers is "principally east of the Mississippi River." *Id.* However, the fact that J.R. Short ships over a third of its brewer's grits production west of the Mississippi clearly indicates that J.R. Short competes with other producers outside its self-defined area of competition in the east. Statements by Agricor's president, although supportive of defendant's position, must be placed in proper context. Agricor, relative to the six major industrial mills, is extremely small and ships only a small percentage of its products by rail. *See* PX 22; PX 35. Agricor is further differentiated in that one customer located 90 miles from its mill, purchases over half of its production. Given these distinctions, Agricor's marketing practices can hardly be accepted as typical among major industrial mills. Thus, Agricor's assessment of geographic markets in which it is capable of competing does not compel the conclusion that separate eastern and western geographic markets exist.

31. Finally, Elders and ICM point to a Commission memorandum prepared in connection with its investigation of Bunge's unsuccessful attempt to purchase Lincoln earlier this year which discusses national and western markets for prime products. Although the memorandum appears to explore the possibility that the western United States might constitute a separate geographic market for analyzing Bunge's proposed acquisition of Lincoln, the language contained in the memorandum makes clear that any such geographic definitions were purely tentative in nature. No conclusions regarding the relevant geographic market were ever made in the memorandum. In fact, the memorandum unequivocally indicates that United States might be the proper geographic market for purposes reviewing the Bunge proposal for antitrust concerns. Thus, the memorandum offers little actual support for defendants' market definitions.

32. Though Elders and ICM's assertion of eastern and western geographic markets cannot be summarily dismissed, the weight

of evidence presented in this case clearly supports this court's finding of a national geographic market for industrial milled prime products. As the relevant product and geographic markets are defined, the next step is to determine the likely effects of the transaction at issue.

### C. Competitive Effects

■ 33. Analysis of a merger's competitive significance begins with consideration of market shares of the combined firms and proceeds from there to a review of qualitative factors to determine whether the merger poses a "significant threat to competition." *Merger Guidelines*, 2 Trade Reg.Reg.Rep. (CCH) ¶ 4503; *Statement of the FTC Concerning Horizontal Mergers*, [Jan.–June 1982 Special Supplement] Antitrust & Trade Reg.Rep. (BNA) No. 1069 at 5–12 (June 12, 1982) (*"FTC Statement"*). *See also United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *Kaiser Aluminum & Chemical Corp. v. F.T.C.*, 652 F.2d 1324 (7th Cir.1981). Among the qualitative factors most important to consider in assessing the potential for a merger to cause competitive harm are the difficulty of entry into the market and other market characteristics that may be conducive to interdependent or noncompetitive behavior. *FTC Statement, supra; see also* Posner, *Antitrust Law: An Economic Perspective*, 55–61 (1976).

34. The Supreme Court has observed that as concentration in a particular product and geographic market increases, "greater is the likelihood that parallel policies of mutual advantage not competition, will emerge." *United States v. Aluminum Co. of America*, 377 U.S. 271, 280, 84 S.Ct. 1283, 1289, 12 L.Ed.2d 314 (1964). *See also United States v. Philadelphia National Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1964). "This conclusion rests upon the theory that where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels." *FTC v. PPG Indus-*

*tries, Inc.*, 798 F.2d 1500, 1503 (D.C.Cir. 1986).

35. Concentration is commonly measured by calculating both the four-firm concentration ratio and the more sensitive Herfindahl–Hirschman Index ("HHI"). *Id.* Under either method, the acquisition at issue raises concentration significantly in an already highly concentrated market. After acquiring Lincoln's milling assets, ICM will control slightly more than 32 percent of the relevant market. *See* FF ¶ 32, *supra*. The postacquisition four-firm concentration ratio jumps from 79 percent to 88 percent. *Id.* Similarly, the preacquisition HHI of 2114, which itself denotes a highly concentrated market, increases some 480 points to 2606 when the Lincoln asset sale is recognized. *See* FF ¶¶ 33–34, *supra*.

36. The concentration levels here exceed levels found in other cases in which courts have found a violation of Section 7. In some cases, such concentration levels established a *prima facie* case of illegality. *See RSR Corp. v. FTC*, 602 F.2d at 1324–25 (four-firm concentration 72.40 percent, combined share 19.18 percent); *Liggett & Meyers, Inc. v. FTC*, 567 F.2d 1273, 1275–76 (4th Cir.1977) (four-firm concentration 54.44 percent, combined share 15.4 percent); *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed. 2d 530 (1974) (four-firm concentration 43 percent, combined share 23.2 percent; *prima facie* showing of illegality rebutted by other factors).

37. Difficulty of entry is a factor which increases concern over competitive effects of an acquisition. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 579, 87 S.Ct. 1224, 1230, 18 L.Ed.2d 303 (1967); *United States Steel Corp. v. FTC*, 426 F.2d 592 (6th Cir. 1970); *Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315, 325 (N.D.Ohio 1981), *aff'd* 669 F.2d 378 (6th Cir.1980). As the Second Circuit observed in *Fruehauf Corp. v. FTC*, 603 F.2d 345, 357 (2d Cir.1979), "high entry barriers may be a signal that a particular merger carries a potential for impairing competition, but barriers need not reach some predetermined level before an anticompetitive effect becomes possible."

38. Industrial dry corn mills are expensive to build and, if they fail, have little salvage value. *See* FF ¶ 35, *supra.* Major producers recognize that entry into the industrial corn milling industry requires the construction of a large and expensive facility. *Id.* Recent and past experience has shown that a new entrant cannot come into the market without first securing substantial contracts to minimize the risk. *Id.* The most recent example of *de novo* entry is Agricor's construction of a corn mill in Marion, Indiana in 1983. Agricor entered the market only after it had secured a long-term commitment from Miles Laboratories, and even then it took Agricor more than three years to negotiate with Miles, construct its plant, and produce marketable brewer's grits. *See* PX 1; PX 22. Similarly, ICM began construction of its Evans, Illinois dry corn mill in 1976. *See* PX 1 at ¶ 17. It did not complete construction until 1982, and did not conclude the shakedown and modifications of the mill until 1985—nearly nine years after the project was started. *Id.* In addition, the testimony of Mr. Wiggins, ICM's Chief Executive Officer, regarding the likelihood of *de novo* entry and entry through the conversion of wheat mills is highly probative. Mr. Wiggins testified that entry is difficult, time consuming, expensive and unlikely. *See* Tr. at 134–35.

39. In sum, the evidence presented shows the Commission possesses a significant likelihood of ultimate success on the merits. Facts adduced at the hearing indicate that ICM and Elders compete against each other for a significant number of the same customers. *See* FF ¶ 24, *supra.* ICM's acquisition of Lincoln's milling assets will thus eliminate existing and future competition between the two firms. Prior to ICM's purchase of Lincoln's milling assets, the industrial dry corn milling industry was highly concentrated. Sharp postacquisition increases in the four-firm concentration ratio and the HHI strongly support the Commission's assertion that the challenged acquisition is likely to result in anticompetitive conduct among remaining producers of industrial milled prime products. Moreover, given the noted cost and

time barriers for *de novo* entry, little chance exists that new suppliers of prime products will appear in the event of a small but significant nontransitory price increase. Although ICM's expertise in industrial milling may result in significant cost savings at the Lincoln facility, it does not follow that competition in the relevant market will be enhanced. The weight of evidence presented in this case suggests, rather, that ICM's purchase of Lincoln's milling assets will allow remaining competitors to overtly or tacitly coordinate their behavior to restrict output and achieve profits above competitive levels.

### V. *Public Interest*

40. Once a substantial likelihood of success on the merits is demonstrated, the court must consider whether the equities favor the issuance of preliminary relief and if so what type of relief is necessary and appropriate. *FTC v. Weyerhaeuser Co.,* 665 F.2d at 1076; *United States v. Coca-Cola Bottling Co. of Los Angeles,* 575 F.2d at 226; *FTC v. Great Lakes Chemical Corp.,* 528 F.Supp. at 86–87, 99. An examination of the facts in the present case indicates that the public interest will be benefited by a grant of preliminary relief. As discussed above, ICM's acquisition of Lincoln's milling assets creates a strong likelihood that producers will engage in anticompetitive conduct causing the price of industrial milled prime products to rise above competitive levels. The challenged transaction thus poses a direct and immediate threat to the public in the form of higher prices for prime products and the food products derived therefrom.

41. Elders and ICM resist the conclusion that the equities favor the issuance of preliminary relief with two basic arguments. First, defendants note that Elders acquired Lincoln in 1987 to obtain its grain elevators and desired to sell Lincoln's dry corn mill because it lacked any experience operating such a facility. Since ICM possesses considerable expertise in producing high quality prime products and Elders does not, defendants argue that the Lincoln facility will be a more efficient producer under ICM and that the public

will benefit by increased competition in the western United States. Elders and ICM's second argument underscores the financial and economic hardships both firms will face if the challenged transaction is rescinded or otherwise enjoined.

42. Elders and ICM's first argument fails to persuade this court because it rests heavily on the assumption that eastern and western geographic markets for prime products exist. As earlier defined, the relevant geographic market for measuring the effect of the challenged transaction is the United States. Even assuming Elders is unable to efficiently operate the Lincoln mill, it does not follow that competition in the relevant geographic market will be enhanced by the challenged acquisition. Rather than lower prices for consumers, the likely result of the Lincoln acquisition will be greater mill profitability. Thus, Elders and ICM fail to demonstrate that public will be adversely affected if the transaction is rescinded or enjoined.

43. Defendants' second argument concerns only private interests which will be harmed if the Commission's motion for preliminary is granted. Although private interests may be considered when balancing the equities, they are subordinate to public interests and cannot alone support the denial of preliminary relief. *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C.Cir. 1981). As such, Elders and ICM are unable to defeat the Commission's motion on the grounds that their private financial and economic interests will be impaired if preliminary relief is granted.

44. As this court concludes that the Commission possesses a significant likelihood of success on the merits and public equities favor the issuance of preliminary injunction, the final issue to be addressed is what type of relief is necessary to preserve an adequate remedy should the Commission ultimately prevail on its claim that the acquisition violates § 7 of the Clayton Act.

## VI. *Preliminary Relief*

45. One of the principal reasons for enjoining mergers is the historic difficulty of determining how to split an ongoing operation into two viable entities when attempt-

ing to enforce a divestiture order after the fact. This persistent problem has been long recognized by courts, and is the underlying reason for the Commission's authority to seek preliminary relief under Section 13(b) of the FTC Act. *FTC v. PPG Industries, Inc.*, 798 F.2d 1500, 1507–08 (D.C.Cir. 1986); *FTC v. Warner Communication, Inc.*, 742 F.2d 1156, 1165 (9th Cir.1984). Because most acquisitions present the probability that owners will commingle and consolidate corporate assets and operations, reliance upon an ability to "unscramble the eggs" following a full administrative adjudication is generally misplaced. *Id.; see also FTC v. Rhinechem Corp.*, 459 F.Supp. 785, 790 (N.D.Ill.1978).

46. In the present case, Elders and ICM argue that difficulty exists in applying the foregoing principles because the "eggs have already been cracked." ICM completed its acquisition on Lincoln's milling assets on June 5, 1988 and has assumed operation of the mill. As a result, Elders and ICM assert that confidential trade information has been exchanged and rescission will not return the parties to their original positions. These facts, however, do not restrict this court from granting preliminary relief pending administrative litigation. *See FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir.1982) (asset freeze entered pending completion of administrative proceedings to ensure availability of effective final remedy); *FTC v. Weyerhaeuser Co.*, 648 F.2d 739 (D.C.Cir. 1981) (acquisition ordered rescinded pending appellate review where parties consummated challenged transaction prior to resolution of appeal); *SEC v. Keller Corp.*, 323 F.2d 397 (7th Cir.1963) (temporary receiver appointed on showing of likely success).

47. The facts in the instant case reveal that ICM and Elders were well aware that the Commission possessed serious reservations about the legality of the Lincoln sale before it was consummated. Letters from Commission attorneys requesting that Elders and ICM refrain from closing the Lincoln sale until the Commission's antitrust concerns were judicially resolved fell on deaf ears. *See* PX 27. In fact, the record

strongly suggests that the parties advanced the tentative closing date to a Sunday afternoon to thwart the Commission's attempt to block the sale. Elders and ICM chose to accept the risk that a court might later agree with the Commission's assessment of possible § 7 violations and order the transaction be set aside. The fact Elders and ICM decided to persevere in the face of such uncertainty is not a valid reason for denying preliminary relief.

48. If the Commission succeeds on the merits of its case, the only suitable relief appears to be divestiture. Given the nature of the assets acquired, any loss of competition resulting from the challenged transaction could only be remedied by transferring Lincoln's milling facilities to an independent party. Because of the small number of competitors presently existing in the industrial milling industry, serious difficulties could arise in finding a suitable buyer after a divestiture order. Moreover, ICM intends to consolidate operations at the Lincoln facility and eliminate personnel whose functions are mirrored by existing ICM employees. If ICM is allowed to maintain the Lincoln mill during the pendency of administrative litigation which often exceeds several years in duration, *see FTC v. Occidental Petroleum Corp.,* 1986–1 Trade Cas. (CCH) ¶ 67,071 at 62,516 (D.D.C.1986) [available on WESTLAW, 1986 WL 952], important personnel will be lost, and Lincoln's ability to function as an independent competitor after divestiture will be jeopardized. Thus, to preserve the viability of divestiture as an ultimate remedy, an order appointing a trustee to manage the acquired assets or rescinding the sale is required.

49. Evidence received during hearings on the Commission's motion made clear that appointing a trustee to manage milling operations pending administrative litigation would likely spell doom for the continued existence of Lincoln as a viable competitor. Many of Lincoln's key management personnel have left and locating a qualified trustee, due to the small size of the dry corn milling industry, would be difficult if not impossible. Thus, appointment of a trustee would not be prudent in the present case.

50. Rescission of the consummated transaction is the only preliminary remedy which will ensure the availability of adequate relief after a trial on the merits and preserve competition pending the resolution of administrative litigation. Continuation of the present hold separate order during years of administrative proceedings before the Commission will only multiply uncertainty about the future of the Lincoln mill and restrict ICM and Elders from pursuing other business opportunities. However, ordering immediate rescission of the challenged transaction before Elders and ICM exhaust their right to appeal would result in unnecessary transaction costs if this court's decision is later reversed. Given the nature of this case, the Circuit Court is likely to afford prompt attention to any appeal of this decision. Because the potential for harm to competition during appeal is minimal under the present hold separate order, rescission of the challenged transaction is stayed pending exhaustion of appeal to the Seventh Circuit. During the interim period, the terms of the agreed hold separate order dated June 14, 1988 will apply.

51. To the extent that any of the foregoing conclusions of law are deemed to be findings of fact, they are hereby adopted as findings of fact.

### VII. *Conclusion*

For the foregoing reasons, Commission's motion for reconsideration of leave to file a claim under § 18a(g)(2) of the Hart–Scott–Rodino Act is denied, but motion for preliminary relief in the form of an injunction ordering rescission of the consummated acquisition of Lincoln's milling assets by defendant ICM from defendant Elders is granted. Execution of the rescission order is stayed, however, pending exhaustion of appeal to the Seventh Circuit.

IT IS SO ORDERED.